Filed 4/3/15  P. v. Lawhead CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C072151 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F05982) |
| v. | |
| JAMES EARL LAWHEAD, | |
| Defendant and Appellant. | |

A jury convicted defendant James Earl Lawhead of second degree robbery (Pen. Code, § 211),[1] two counts of felon in possession of a firearm (§ 12021, subd. (a)(1)), receiving stolen property (a firearm) (§ 496, subd. (a)), and exhibiting a deadly weapon to a peace officer (§ 417.8), with an enhancement for personal use of a firearm (§ 12022.53, subd. (b)).  The trial court found true five prior strike and serious felony allegations

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

(§§ 1170.12, 667, subds. (a), (b)-(i)) and sentenced defendant to 100 years to life plus 15 years.

On appeal, defendant contends the trial court's denial of his *Romero* motion[2] was an abuse of discretion and his sentence violates the state and federal constitutional prohibitions against cruel and/or unusual punishment. In a supplemental brief, he contends the sentence on either the receiving stolen property conviction (count four), which involved a stolen firearm, or felon in possession of a firearm (count six), which involved the same firearm, should be stayed pursuant to section 654.

We remand for the trial court to stay sentence on count four *or* six, and in all other respects, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution Evidence

Tifanee Blue was a shift manager at a Blockbuster store in Citrus Heights. On July 25, 2010, at around 10:45 a.m., Blue was walking through the parking lot to make a bank deposit when a dark purple PT Cruiser with "blue and ghost-like" iridescent flames cut her off and parked in a disabled parking spot. As Blue went around the PT Cruiser, a door opened and the driver said something to her. The driver had his left leg out of the car and held a small semiautomatic handgun. The man told her to "give me the bag." Frightened, Blue gave him the deposit bag containing $1,157.75. The driver shut the door, quickly backed up, and drove away. Blue returned to the Blockbuster and called 911. The responding officer who spoke with her observed that "[s]he was very shaken up." Later, she was shown two photographic lineups, one including defendant's DMV photograph and the other including defendant's booking photograph after his arrest for

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

the charges in this case. Blue was unable to identify anyone in either photo lineup. The person who robbed her was wearing dark glasses and a baseball hat during the robbery.

Law enforcement officers observed a purple PT Cruiser with flames on the side during surveillance in an unrelated case. They noted the license plate number and determined that as of July 25, 2010, the car was registered to defendant and Annette Dustin at a Sacramento address. Defendant's name was taken off the registration on August 16, 2010.

Jerry Riggs was defendant's parole agent. Riggs last met with defendant in a parking lot on July 27, 2010. At that time, defendant told Riggs he had been evicted from his apartment and was trying to live with his stepfather. He did not plan to be at his new home for several days and would not give an address where he would be staying. Riggs had previously seen defendant in possession of a "maroon-purplish" PT Cruiser that had flames on the side. Defendant failed to appear at his mandatory meeting with Agent Riggs on August 4, 2010.

On August 25, 2010, Eddie Cisneros, a bail agent, received a phone call from a person identifying himself as defendant. The person gave a date of birth and asked for a warrant check. Cisneros contacted the Sacramento County Sheriff's Department and learned defendant had a no-bail warrant for robbery. Cisneros gave the information to the caller, who immediately hung up.

On September 8, 2010, at around 6:00 a.m., Sacramento County Sheriff's Deputy David Treat followed up on a tip and went to a location to arrest defendant. Within a few minutes of his arrival, Deputy Treat saw a Toyota Camry driven by a woman. There was also a passenger slumped down in the front seat with the bill of his hat over his face. Driving a marked patrol vehicle, Deputy Treat followed the car, which took no evasive action. Ultimately, there were three patrol vehicles following the Camry. The car eventually pulled into a McDonald's parking lot and parked.

3

Deputy Treat stopped his patrol car, turned on all of his lights, including the face forward red lamp, and started to exit. The driver raised her hands while the passenger, defendant, put a handgun into his mouth. Deputy Treat ordered the woman out of the car. After she complied, defendant left the car while still holding the gun. Defendant said he wanted law enforcement to kill him. Defendant repeatedly went in and out of the car. He eventually fashioned a sling to keep the gun in his mouth.

During the standoff, defendant told a negotiator that "he did what he did" because he needed money. He had been kicked out of his home and had issues with his mother because of his methamphetamine use. Defendant said he did not want to go to prison.

The standoff ended with defendant's arrest at around 8:00 a.m. Deputies recovered a stolen .380-caliber Bersa handgun at the scene when they arrested defendant. The gun had been stolen in a burglary on September 5, 2010. During a recorded jail visit conversation with his grandmother, defendant admitted he knew that gun had been taken in a burglary. Defendant told his girlfriend in another recorded jail visit that "I did what I did [] because I made a promise to myself years ago that I would never be homeless again."

### Defense Evidence

Defendant's mother, Annette Dustin, was one of the registered owners of the PT Cruiser. The flame decals were removable. She testified that she saw someone other than defendant driving the car, but she did not recognize the driver. She told defendant's parole agent about that sometime in May or June. Dustin removed defendant from the car's registration on August 16, 2010. After defendant was arrested, she reported the car stolen because defendant did not have it and she wanted it back.

Defendant was unemployed when he got out of prison but quickly got two jobs. Dustin got him an apartment and defendant was doing "fantastic" until he started using drugs, causing their relationship to go downhill. Dustin then evicted defendant from the apartment, telling him to vacate by July 24, 2010.

4

## Verdicts and Findings

The jury found defendant guilty of second degree robbery (§ 211), two counts of felon in possession of a firearm (§ 12021, subd. (a)(1)), receiving stolen property (a firearm) (§ 496, subd. (a)), and exhibiting a deadly weapon to a peace officer (§ 417.8). The jury also found true an enhancement for personal use of a firearm (§ 12022.53, subd. (b)). Defendant was acquitted of the burglary in which the stolen firearm had been taken.

After a court trial on the prior conviction allegations, the trial court found true allegations that defendant had sustained five prior strike and serious felony convictions. (§§ 1170.12, 667, subds. (a), (b)-(i).)

## *Romero* Motion

Defendant's five prior strike convictions were all from a single proceeding in the state of Washington in January 1999. The convictions were robbery, two counts of assault, burglary, and theft of a firearm.[3]

According to the probation report, the facts of the prior convictions are as follows. On May 5, 1998, a woman stopped by her parents' home to drop off some items. She became suspicious after seeing the doors wide open and no one home. The woman entered the home with her five-year-old son so she could use the phone to call her mother. Defendant, who was armed with a handgun, came up behind the woman as she entered. He pulled the slide back on the gun and ordered her to hang up the phone and get on the ground. The woman grabbed her son and placed her body over him, pleading with defendant to spare her life. Defendant held the barrel of the gun to her head, cut the cord to the phone, and then walked to the kitchen.

---

[3] The trial court found all of the Washington priors were serious felonies because defendant used a firearm in the commission of all five offenses.

The woman heard defendant speaking to another person, and could hear one of them say the woman should be killed. Defendant planned to make the woman go with them until she begged him to leave her and her son alone. The burglars eventually drove off, taking her father's truck from the residence. The burglars also took coins and collectables valued at $21,000 and a .45-caliber handgun.

Defendant was convicted on the five counts and sentenced to 147 months in Washington state prison. On April 1, 2009, he requested a parole transfer from Washington to California. His discharge date was to be June 3, 2012. In preparing the presentence report, the probation department was not able to obtain defendant's release date from the prison in Washington, but defense counsel told the trial court defendant was paroled on July 20, 2009.

Defendant was born in January 1981. He had a California juvenile adjudication for misdemeanor vehicle theft in April 1995, juvenile adjudications in Washington for burglary and possession of a firearm in November 1995, a felony escape in April 1997, and possession of stolen property in October 1998.

Defendant told the probation officer who wrote the presentence report that he was addicted to methamphetamine. He first used the drug when he was 17, but did not use it for the first six months out of prison. He had only recently started using it again.

In his *Romero* motion, defendant argued that the Washington convictions were not actually strikes, but if they were, then the five prior strikes should be treated as a single strike conviction because they arose during a continuous course of conduct. He also argued that the trial court should dismiss the strike allegations in the interest of justice.

In ruling on the *Romero* motion, the trial court observed defendant was "respectful, articulate and well-behaved" during the court proceedings. But as the court observed, its focus was not on defendant's demeanor and character during trial. Rather, "I'm judging what happened during the crimes both back in Washington and here in California." The court acknowledged that when defendant uses methamphetamine, his

6

"drug of choice," defendant turns into a "different person." Defendant had used methamphetamine within a year of getting out of prison in Washington, even though he promised his mother he would not use the drug as a condition of getting an apartment through her. The trial court found it was very easy for defendant to go from the respectful person he was when he was first paroled and the respectful person in court to the person who "engages in this criminal conduct" out in society, and the court had to protect the community from that person.

Regarding the Washington priors, the trial court reasoned that the five prior strikes involved separate courses of conduct, including the entry into the home, taking the gun, and later threatening the woman and her son with the gun when they stumbled upon the burglary. The crimes involved different victims, different places in the house, different motives, and different actions. As with the Washington crimes, defendant's current offense had a "level of cruelty" from the robbery at the video store "all the way until the weapon is drawn in the presence of law enforcement."

The trial court saw the video of the standoff, where the police "did everything they could" and it was "a short reach . . . to take the gun from his head and aim it at an officer." The court reasoned that the person it saw in the video "and the person who engaged in these crimes" did not warrant the trial court granting the *Romero* motion.

Summing up, the trial court said, "It kills me to put somebody at 31 years of age into a penitentiary for a very substantial period of his life, if not the remainder of his life. I hate that. That's the toughest part of my job. But under these circumstances, I can't see how I can avoid it." Reiterating its finding that the prior strikes involved separate courses of conduct, the trial court denied the *Romero* motion. The court then proceeded to conduct the sentencing hearing.

Defendant's grandmother addressed the court in the sentencing hearing. Defendant's father served an 11-year prison term for rape in 1980 and had very little contact with defendant. Defendant was in and out of juvenile hall growing up, as there

7

were no programs available to teach troubled kids the difference between right and wrong. She believed the absence of his father had a profound effect on defendant. When he was released from prison in 2009, defendant was 28 1/2 years old, "but 18 street-wise." "He is very smart, extremely funny and very loving. He has always been respectful and polite, and he loves children. [¶] That all changes when drugs are involved. [¶] He just doesn't love himself enough to make the right choices."

In sentencing defendant, the trial court said it "spent a lot of time on this," having "re-read these materials several times; late at night, at lunch hours and early in the morning trying to figure out what I can do, what should I do." It found that "the problem is, is that the defendant himself has left me very few options here. I'm not sure that I have any options here." Recognizing the many problems in defendant's life, his father's incarceration and his own drug use, the court said it did not "have a magic wand" to wave "and say all right. No more drugs." Reiterating the danger defendant posed to the officers in the standoff, the trial court concluded, "I don't have a lot of options available to me as much as I wish that I did." The court then noted defendant was statutorily ineligible for probation, listed several circumstances in aggravation,[4] found that counts one, four, five, and six were predominantly independent of each other and then imposed

---

[4] Regarding factors in aggravation, the trial court observed, "these crimes involved great violence . . . [the] threat of bodily harm. [¶] And . . . I believe that while it may not be the person that the family knows, the person who engaged in these criminal acts showed a high degree of cruelty and viciousness and . . . callousness. [¶] The crimes were committed in a manner showing planning, sophistication and a clear intent. [¶] [Defendant] has engaged in violent conduct before, and he certainly did again here indicating a very serious danger to society. [¶] His prior convictions as an adult and his sustained petitions in Juvenile Delinquency proceedings are numerous and of increasing seriousness. [¶] He served a prior prison term. As I pointed out a moment ago, had only been out of prison approximately one year when he then returned to the life of crime and . . . was on parole when the crimes were committed, showing us that his prior performance on parole [was] grossly unsatisfactory."

8

sentence on each count.  The court sentenced defendant to 100 years to life plus 15 years.

Defendant did not object to this sentence.

## DISCUSSION

## I.  *Romero* Motion

## A.  Applicable Law

Defendant contends it was an abuse of discretion for the trial court not to dismiss at least four of his five prior strike convictions as to all counts or dismiss four strike convictions as to the subordinate counts.  We disagree.

A trial court has the authority to dismiss a strike conviction allegation in the interests of justice under section 1385, subdivision (a).  (*Romero*, *supra*, 13 Cal.4th at p. 504.)  A trial court also has the discretion to dismiss strike allegations on a count-by-count basis.  (*People v. Garcia* (1999) 20 Cal.4th 490, 499 (*Garcia*).)  We review a trial court's refusal to dismiss strike allegations under the deferential abuse of discretion standard.  (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." '  [Citations.]  Second, a ' "decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " '  [Citations.]  Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)

In deciding whether to exercise its discretion to dismiss strike allegations, courts must determine whether the defendant should be deemed outside the spirit of the three

9

strikes law and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies. (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).) In making this determination courts must consider three circumstances: (1) the nature and circumstances of his present felony; (2) the nature and circumstances of his strike offense; and (3) the particulars of the defendant's background, character, and prospects for the future. (*Ibid*.)

## B. Analysis

Defendant asserts the trial court's failure to dismiss four of the five strikes was an abuse of discretion because "the trial court did not consider all relevant sentencing factors which supported dismissing some of [defendant]'s prior strikes, and it also failed to consider viable sentencing alternatives." According to defendant, the trial court did not consider that defendant's adult criminal history consists entirely of the current offenses and all of the strikes "occurred during the same incident." He claims the trial court did not consider that defendant was 17 when he committed the strikes, "more than a decade before the current offenses." Defendant further claims the trial court's statement, "I don't have a lot of options available to me as much as I wish that I did" was wrong, as it could have dismissed four of the strikes on all counts or just the subordinate terms.

Defendant argues on appeal that dismissing all of his strikes produces a sentence of 22 years 4 months, and dismissing four of the five strikes leads to a sentence of 29 years 8 months. Imposition of the latter sentence would mean he would not be eligible for parole until he was 55 and therefore unlikely to reoffend. Defendant also argues on appeal that the trial court could have sentenced defendant to 25 years to life by dismissing the strike allegations as to the subordinate terms. (See *Garcia*, *supra*, 20 Cal.4th at p. 499.) Arguing that the robbery "was a relatively minor offense that resulted in the theft of less than $1,200" in which he made no explicit threats to use the gun against the victim and nobody was injured, defendant maintains that a sentence of 115

10

years to life for a 29 year old based on the instant charges "exceeds the bounds of reason."

As our high court has noted, "any failure on the part of a defendant to invite the court to dismiss under section 1385 following *Romero* waives or forfeits his or her right to raise the issue on appeal. [Citation.]" (*Carmony*, *supra*, 33 Cal.4th at pp. 375-376.) Based on this, we hold that a defendant forfeits any claim that the trial should have found defendant partially outside the spirit of the three strikes law and dismissed strikes as to only some counts pursuant to *Garcia*, *supra*, 20 Cal.4th 490 if that request is not made in the trial court. Here, defendant did ask the trial court to treat all of the strikes as a single strike and further asked the court to dismiss strikes, but he never proposed the alternative of dismissing four strikes as to the subordinate terms. His contention that the trial court should have considered that option is forfeited.

As for the option of dismissing strike allegations on all counts, contrary to defendant's assertions, there is no indication that the trial court was unaware of its discretion to do so. Indeed, that was one of the two options defendant argued in the trial court. And the prosecution opposed defendant's request to dismiss strikes in its written opposition, arguing it was not in the interest of justice to do so under the analysis in *Williams*, *supra*, 17 Cal.4th 148.

Defendant seizes upon the trial court's statement, "defendant himself has left me very few options here. I'm not sure that I have any options here," as evidence the court misunderstood its discretion under section 1385. The trial court's statement that it did not have any options was not made when deciding the *Romero* motion. Rather, the court said that *after* the *Romero* motion was denied, well after the sentencing hearing had commenced, just before it imposed sentence. Examined in its proper context, this statement accurately reflects the law. Denial of the *Romero* motion meant defendant was to be sentenced under the three strikes law, which mandates consecutive sentences of 25 years to life for each felony "not committed on the same occasion, and not arising from

11

the same set of operative facts." (§ 667, subd. (c)(6); *People v. Lawrence* (2000) 24 Cal.4th 219, 222-223.) Once the trial court denied the *Romero* motion, it had to impose consecutive 25 years to life terms for all four of defendant's felony convictions.

As for defendant's age, the lapse of time between the strike offenses and the current offense, defendant's substance abuse problem and the facts that defendant did not expressly threaten to shoot the victim here and nobody was hurt, the trial court was well aware of those circumstances. It reviewed the probation report and presided over the trial. Even when we factor the circumstances defendant highlights here into the three-prong analysis outlined by our high court in *Williams* (*Williams*, *supra*, 17 Cal.4th at p. 161), we conclude the court's decision not to dismiss any strikes was not "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)

### 1. Nature and Circumstances of the Current Offense

The strike offense was violent and involved the use of a gun. It showed a level of planning and sophistication in that defendant targeted an individual who was on her way to make a deposit of store receipts. In light of the fear defendant caused, we conclude that any mitigation from the fact that he did not expressly threaten to use the gun and did not hurt the victim during this armed robbery was minimal.

To make matters worse, defendant engaged in a lengthy public standoff with sheriff's deputies, in an apparent attempt to induce the deputies to shoot him. The trial court correctly found that the situation defendant created posed a threat to public safety.

The current offenses were not part of a single incident, but involved at least three separate criminal acts, all involving a firearm: obtaining the stolen gun, the armed robbery, and finally, the armed standoff with the police.

### 2. Nature and Circumstances of the Strike Convictions

The prior strike offenses were not non-violent; they involved a burglary turned home invasion. It seems defendant could have walked away from the burglary, but

12

instead confronted the victim and her young son. Defendant pulled the slide of his gun back and pointed the gun at the victim's head. The victim no doubt thought she and her son were going to be killed and she begged defendant to spare their lives. There is nothing mitigating about these offenses. Indeed, these offenses are extremely aggravating.

### 3. Defendant's Background, Character, and Prospects for the Future

Defendant had a criminal history beginning when he was 14 years old. One of his five juvenile adjudications involved burglary and possession of a firearm.

Defendant was 17 when he committed his prior strike offenses, but he was old enough and his crimes were sufficiently serious for him to be tried as an adult. The 11 years between his strikes and the current offenses is not the result of some break in criminal activity. Defendant was incarcerated for most of that time, and committed the current offenses a little more than a year after his release from prison.

Defendant's life is one of almost continuous offending, a lengthy juvenile record including several felonies, followed by five strike convictions, and then the current offenses a relatively short time after his release from prison and while he was on parole. And it seems defendant was prepared to go on a crime spree. During a recorded jail visit conversation, defendant remarked, "It's good that it happened the way it did. It's good that it's only three charges and not 50. Cause another month and it would have been 50."

Defendant's current crimes and criminal history show that when he is not incarcerated, he is highly likely to commit violent offenses involving the use of firearms. It was not an abuse of discretion to deny his *Romero* motion.

### II. Cruel and Unusual Punishment

Defendant contends his sentence of 100 years to life plus 15 years constitutes cruel and/or unusual punishment under the state and federal Constitutions.

Defendant's *Romero* motion did not include and is not a substitute for a claim that his sentence is cruel and unusual punishment. He likewise did not assert his sentence was

13

cruel and unusual when the trial court imposed sentence. This forfeits his contention on appeal.[5] (*People v. Norman* (2003) 109 Cal.App.4th 221, 229 (*Norman*).)

Defendant's claim also fails on the merits. A punishment may violate the California Constitution if, although not "cruel or unusual" in its method, the punishment "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.) Similarly, "an Eighth Amendment analysis requires a finding of 'gross disproportionality' between the offense and the offender and the punishment. [Citations.]" (*Norman*, *supra*, 109 Cal.App.4th at p. 230.)

Relying on a concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, 600-602, in which Justice Mosk opined that a sentence that is impossible to serve is per se cruel and unusual, defendant contends his 100 years to life plus 15 years sentence is disproportionate to the current offenses even considering the current offenses and his criminal history. He further claims that a sentence which is "more than 85 years longer than the upper term second strike sentence that could be imposed for the same offenses and enhancements" is disproportionate to him as the offender and to his offenses.

This court has previously rejected reliance on Justice Mosk's concurrence. In *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231, this court wrote: " ' " [N]o opinion has value as a precedent on points as to which there is no agreement of a majority of the court. [Citations.]" [Citations.] Because no other justice on our Supreme Court joined in Justice Mosk's concurring opinion [in *Deloza*], it has no precedential value.' Accordingly, there is no authority for defendant's argument." We again reject the theory

---

[5] Defendant's section 1385 motion does not preserve the claim, as that motion does not substitute for litigation under the constitutional provisions prohibiting the imposition of a cruel and unusual sentence. (*People v. Cole* (2001) 88 Cal.App.4th 850, 868-869.)

that a sentence is cruel and unusual because it is impossible for a human being to complete.

Nor do the facts surrounding the commission of the offenses or an individualized assessment of the offender compel a different result. As noted above, we are well acquainted with the factors in mitigation applicable here, including defendant's age and his problem with methamphetamine. These factors do not tip the scale.

Defendant's lengthy and near continuous criminal record beginning as a juvenile (except while incarcerated), and the violent nature of his current and past offenses show that defendant is a serious threat to public safety when he is not incarcerated. His lengthy sentence is neither disproportional to the offense or the offender, and does not violate the state or federal prohibitions against cruel and/or unusual punishment.

### III. Section 654

In a supplemental brief, defendant contends sentence should be stayed pursuant to section 654 on either count four, receiving stolen property (the firearm), or count six, felon in possession of a firearm.[6] The People concede and we agree.

Section 654, subdivision (a), provides in pertinent part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." In short, "section 654 proscribes double punishment for multiple violations of the Penal Code based on the

---

[6] Defendant filed his motion for leave to file a supplemental brief long after briefing had concluded. Our decision to grant the motion as to one issue raised in the supplemental brief should not be taken as an endorsement of filing supplemental briefs. Failure to raise an issue in appellant's opening brief forfeits the contention on appeal. (*Christoff v. Union Pacific Railroad Co*. (2005) 134 Cal.App.4th 118, 125.) We generally do not allow supplemental briefing so that an appellant can overcome this rule, but do here to avoid a claim of ineffective assistance of appellate counsel for failing to raise a contention with obvious merit.

'same act or omission.' " (*People v. Siko* (1988) 45 Cal.3d 820, 822.) If the crimes involve a course of conduct, "[w]hether [the] course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of Cal.* (1960) 55 Cal.2d 11, 19.)

Defendant was convicted of receiving stolen property in count four for receiving a stolen .380-caliber Bersa handgun, the same weapon that formed the basis of his conviction for felon in possession of a firearm in count six.[7] Defendant argues, and the People concede, that he cannot be sentenced for receiving stolen property and felon in possession of a firearm when both crimes involve the same firearm.

A panel of this court addressed this issue in similar circumstances in *People v. Atencio* (2012) 208 Cal.App.4th 1239 (*Atencio*), a case not cited by defendant in his supplemental brief. In *Atencio*, the defendant was convicted of grand theft of a firearm and felon in possession of a firearm after he took a pistol from the victim's house, kept it for a day, and then abandoned it at another person's house. (*Id*. at p. 1243.) This court concluded that both acts were committed pursuant to a single objective, possessing the gun. "To say that defendant's objective on the first day was to *take* the gun, while his objective on the next day was to *possess* it is cutting the point too fine. The only point in *taking* the gun was to *gain possession* of it, so that he could then do with it what he pleased . . . . The fact that defendant kept possession of the gun for a period of 24 hours did not, without more, alter his intent and objective such that his course of criminal conduct can be deemed to consist of more than one act for purposes of section 654." (*Id*.

---

[7] The felon in possession offense in count two was based on possession of a different firearm, the unknown firearm defendant used to commit the robbery. The trial court imposed but stayed a sentence pursuant to section 654 on count two.

at p. 1244.) Since the "defendant's taking of the pistol was merely the means by which he gained possession of it," defendant could be punished only once for both crimes. (*Id.* at p. 1245.)

*Atencio* is dispositive here. As in that case, the defendant committed the crimes of receiving stolen property and felon in possession of a firearm in counts four and six with a single purpose, to possess that firearm. Like in *Atencio*, "what we have here is a course of conduct pursuant to one criminal objective—to possess the gun—and based on that there is but one act that can be punished under section 654." (*Atencio*, *supra*, 208 Cal.App.4th at p. 1245.)

When section 654 applies, the offense with the longest term is imposed. (§ 654, subd. (a).) Defendant received the same three-strikes sentence of 25 years to life on both counts and the base punishments for both crimes is the same (§§ 12021, subd. (a)(1), 496, subd. (a)). We shall remand the case for the trial court to select the count upon which to stay the sentence pursuant to section 654.

## DISPOSITION

The case is remanded for the trial court to stay the sentence on count four *or* count six pursuant to section 654.  In all other respects, the judgment is affirmed.  The trial court is further directed to prepare an amended abstract of judgment reflecting the new sentence and to forward a certified copy to the Department of Corrections and Rehabilitation.


        MURRAY        , J.


We concur:


      RAYE           , P. J.


      MAURO        , J.